Saul S. Streit, J.
This is a motion, in a proceeding pursuant to article 78 of the CPLR, for an order directing respondents, the City Rent and Rehabilitation Administration and the City Rent Administrator, to make a finding that a vacancy rate of 5% or more exists in housing accommodations in the City of New York renting for (a) $200 to $224 per month, (b) $250 to $299 per month, and (c) over $300 per month. In addition, petitioner seeks to compel respondents to schedule a public hearing as a precedent to the making of an order decontrolling housing accommodations in the aforesaid rent ranges.
The petition alleges: (1) that petitioner is the owner of seven buildings containing housing accommodations subject to control under the New York City Rent and Rehabilitation Law; (2) that Local Law No. 20 of the Local Laws of 1962 of New York City provides for abolition of rent controls after a public hearing ‘ ‘ Whenever the city rent agency shall find, after making such studies and investigations as it deems necessary for such purpose, that the percentage of vacancies in all or any particular class of housing accommodations in the city is five per centum or more ” (§ Y51-12.0); (3) that a survey of vacancies in the City of New York, made by the United States Census Bureau in February or March, 1965, pursuant to a contract with the city and delivered to the city in July or August, 1965, disclosed vacancies of more than 5% in housing accommodations renting (a) from $200 to $224 per month, (b) from $250 to $299 per month and (c) for more than $300 per month; (4) that a letter was written on petitioner’s behalf on October 8,1965 to the City Rent Administration, demanding that the latter find that the vacancies in said rent ranges exceed 5% and requesting that a public hearing be held and rent controls abolished for accommodations in those rent ranges; (5) that the Rent Administration replied by letter dated November 22, 1965, in which it stated that the petitioner’s letter assumed that the rent ranges referred to constituted “ classes ” of housing accommodations within the *842 meaning of Local Law No. 20 (§ Y51-12.0), whereas the Administrator, whose function it is to determine what constitutes a ‘ ‘ class ’ ’ of housing accommodations, had not yet made such a determination because there were not yet available to him sufficient data or expert analysis to enable him to do so or to determine whether there is in fact a 5% vacancy rate for any “particular class” of housing accommodations; and (6) that the refusal of respondents to make the requested finding or schedule a public hearing was arbitrary, unreasonable and capricious and that no good reason exists for delaying the making of the desired finding and the holding of a public hearing as a precedent to the abolition of rent controls in the rent ranges previously referred to.
Respondents cross-move for an order dismissing the petition for failure to set forth a good cause of action; for failure of petitioner to exhaust available administrative remedies; and for failure of petitioner to set forth facts showing that it is in any way aggrieved. Respondents also seek summary judgment in their favor.
Prior to the transfer of rent control from the State to the city, the State statute (L. 1946, ch. 274, § 12, subd. 1) provided that “ Whenever the commission shall find that, in any municipality specified by the commission * * * the percentage of vacancies in all or any particular class of housing accommodations is five per centum or more * * * the controls imposed upon rents * * * with respect to any particular class of housing accommodations * * * shall be * * * abolished ’ ’, after the holding of a public hearing. The only pertinent difference between this language of the State statute and that of its successor, section Y51-12.0 of Local Law No. 20 is that the latter, after the word “ find ” adds “ after making such studies and investigations as it deems necessary for such purpose ”.
In Matter of Hotel Assn. of N. Y. City v. Weaver (3 N Y 2d 206) the petitioner contended that hotels were a “particular class ” of housing accommodations within the meaning of the State statute referred to above, and that, therefore, the refusal of the State Rent Administrator to find that a vacancy rate of more than 5% existed for hotels and to conduct a public hearing preparatory to a decontrol of hotels was arbitrary and capricious. The Administrator contended that “for purposes of decontrol, the word class refers not to the particular type or nature of the accommodation, e.g., hotels, but to accommodations in the general housing market which fall in the same rental *843 level regardless of the fact that the accommodation happens to be in a particular type of building ” (p. 211). The Court of Appeals rejected petitioner’s claim. It pointed out (p. 211) that there was no statutory provision specifying that hotels shall constitute a “ class of housing accommodations ” and that the State statute authorized the Rent Commission to make such classifications and differentiations “as in the judgment of the commission are necessary or proper in order to effectuate the purposes of this act ”. (A similar provision is to be found in § Y51-5.0, subd. i.) The court declared that the issue before it was not (pp. 212-213) “what the ‘ pi-opcr ’ interpretation of ‘ class ’ is, nor whether ‘ class ’ could or has been interpreted to mean hotels, but whether the interpretation of the word ‘ class ’ adopted by the commission is arbitrary or capricious.” The holding was that the commission’s determination was reasonable and founded upon a rational basis, its classification being-well suited to the purposes of the rent law.
This decision of our highest court is clear and decisive authority for the proposition that the interpretation of what constitutes a “particular class” for purposes of the State vacancy decontrol statute was a matter to be determined by the Rent Commission “as in the judgment of the commission are necessary or proper” (p. 211). The same principle applies to section Y51-12.0, the successor of the State statute, especially since the provisions of the State statute relied upon by the Court of Appeals are also contained in Local Law No. 20 (§ Y51-5.0, subd. g, par. [1]; subd. i). It is to be noted that, as in the case of the State statute, there is no provision in Local Law No. 20 or in the regulations defining- or specifying what shall constitute a “particular class” for the purposes of the statute dealing with decontrol where vacancies in a particular class exceed 5%.
There has, as far as appears, never been any determination by the State or city rent authorities that housing accommodations renting for $200 to $224 per month, $250 to $299 per month, and more than $300 per month constitute separate “ particular classes ” within the meaning- of the vacancy decontrol statutes.
Petitioner proceeds upon the assumption that respondents, by engaging the United States Census Bureau to make a survey as to vacancies in 15 different rent ranges, including the three rent ranges which are the subject of this proceeding, thereby determined that the 15 rent ranges as to which the vacancy survey was sought were the 1 ‘ particular classes” of housing accommodations referred to in section Y51-12.0, as the bases *844 for decontrols in the case of vacancies of 5% or more. Tjhis is, on its very face, an unwarranted assumption, and no facts are set forth in the petition to support it.
The survey by the Census Bureau was contracted for by the City of New York in order to comply with section Y51-16.0 (formerly section Y41-16.0) of Local Law No. 20, which provides that on or before May 1, 1963 and at least once in every second year thereafter, the Mayor shall cause to be made, and shall present to the Council a report of the results of, a survey of the supply of housing accommodations within the city, the condition of such accommodations and the need for continuing the regulation and control of residential rents and evictions within the city. The contract with the Census Bureau, made November 30, 1964, provides for a survey as to 45 different main items including household composition, age and sex of head of household, color and ethnic group of head, number of persons in household, 1964 incomes of primary families and individual occupants, classification of structures, age of structures, units in each structure, existence of elevators, number of rooms, number of persons per room, number of bedrooms, existence of kitchens and cooking equipment, and a host of others. Item 32 calls for information as to the occupancies and vacancies in accommodations in 15 different monthly rent ranges: 1 ‘ Less than $30; $30-$39; $40-$49; $50-$59; $60-$69; $70-$79; $80-$99; $100-$124; $125-$149; $150-$174; $175-$199; $200-$224; $225-$249; $250 — $299; $300 or more ”,
It is clear that the object of the contract for a survey was to obtain a wide variety of statistical data for the broad purpose of preparing the comprehensive report required by section Y51-16.0. The mere fact that included in the data requested were statistics as to rents and vacancies in 15 different rent ranges did not necessarily constitute a determination by the Bent Administrator that each of these rent ranges constituted a separate “particular class” for the purposes of section Y51-12.0, dealing with decontrols in the case of vacancies of 5% or more of a “ particular class ”. Obviously, for example, the request for data as to many of the very low rent ranges, such as $80 to $99 per month, was made without any thought of the possibility of using those ranges as classes for possible decontrol of housing accommodations in those ranges, pursuant to section Y51-12.0.
Prior to the making of the contract with the Census Bureau, by letter dated June 10, 1964, respondents had advised the *845 Census Bureau that in addition to the information called for in the contract they were also interested in obtaining a “ parallel survey of apartments in the higher rent classes” viz.: as to apartments renting for over $100, ‘1 an additional study in depth that will provide estimates of available vacancy rates and of housing and household characteristics ”. The letter stated that “ by far the most meaningful ” procedure would be to classify higher-rent apartments “ by number of rooms and monthly contract rent starting at $100 and going to $300 — or — more in $50 intervals ” (emphasis supplied). Such an additional survey and an alternate one suggested by the Census Bureau as cheaper-proved to be so expensive that respondents were unable to obtain the required budgetary appropriation, and the additional survey was never made. It is clear from the foregoing that respondents as early as 1964 were of the opinion that the proper classification of the higher-rent apartments might ultimately depend on the number of rooms and upon rentals at intervals of $50 per month (as distinguished from the $25 intervals in many of the rent ranges in item 32 of the contract with the Census Bureau).
At any rate, the affidavit of the First Deputy Administrator, unequivocally states that ‘ ‘ by contracting for the survey the Administrator did not intend to ‘ classify ’ such housing as the petition alleges. * * * The subgroups are not to be construed as a predetermined ‘ class ’ for the purpose of section Y51-12.0 of the Administrative Code, or indeed for the purpose of any other statutory provision.” This statement as to the Administrator’s intentions must be accepted as true, there being no evidence whatever tending to discredit it.
On or about March 25, 1965, the City Rent Administration entered into a contract with Dr. Chester Rapkin, stated to be a “nationally known authority on housing ”, which requires him to conduct research into other sources (i.e., other than the census data) providing information about the housing market in New York City; to design, compile and compute tabulations required for analysis of the Census material, to analyze and evaluate the statistical data so as to comply with the State enabling act and the city rent law, and to report thereon. Respondents are awaiting Dr. Rapkin’s report which has been delayed because between October 15,1965 and January 15, 1966, Dr. Rapkin, at the request of the President, acted as Director for a Presidential Task Force in Washington, D. C., an activity which, he states, “ absorbed all my time during that period”. Dr. Rapkin has written that he expects to have a discussion draft ready by April 1,1966.
*846 The affidavit of the First Deputy Administrator states that the Administrator is of the opinion that no action should or can be taken until Dr. Eapkin’s “necessary analysis ” is received and studied.
It is clear that respondents have as yet made no determination of what shall constitute the “ particular ” classes referred to in section Y51-12.0. That section, unlike the predecessor state statute, expressly authorizes the rent authority to make “ such studies and investigations as it deems necessary ” before making a finding that the vacancies in any particular class are 5% or more. The Eent Administration is not bound by the rental ranges as to which statistical data were requested from the Census Bureau or by the data furnished by the latter. It is entitled to the further information and analysis which it engaged! Dr. Baplcin to furnish almost a year ago and which has unfortunately been delayed only by reason of the President’s call on. Dr. Baplcin’s services. It may be that, on the basis of Dr.. Baplcin’s report, the Bent Administration may fix particular-classes of housing accommodations according to different rental! ranges from those requested in the contract with the Census; Bureau. If, for example, the Administration should determine-, that housing accommodations renting from $175 per month to. $249 per month constitute a single particular class for the; purposes of decontrol for vacancies, there would be no decontrol' of that class because the vacancy rate would be less than 5% of.' the rented and vacant units in the class. If the Administration-should group the rentals from $200 to $249 in one class, the. vacancy rate would again be less than 5% of the class. If all' the rent ranges from $175 to $299 per month are treated as one. class, the vacancy rate for that class would also be less than 5%. If all rents above $125 per month are treated as one class,, the vacancy rate for this class, too, would be less than 5%. It is thus clear that a determination by the Bent Administration of how the class or classes referred to in section Y51-12.0 shall bo made up is a necessary condition precedent to any finding of' vacancies of 5% or more.
The Bent Administration, it is to be noted, is under no legal compulsion to make a separate ‘ ‘ particular class ’ ’ for every $25 difference in the monthly rent. It may not be amiss, at this point, to call attention to the anomalous situation which would result if the classes were to follow the rent ranges as to which survey was requested. Apartments renting for $200 to $224 would be decontrolled while those renting for $225 to $249, a higher rent, would remain under control. One would expect *847 decontrol for vacancies of the more expensive apartments rather than the less expensive ones.
Since respondents have as yet made no determination of what constitutes “a particular class of housing accommodations'” within the meaning of section Y51-12.0, it must follow that this proceeding is premature and that petitioner has failed to make out a case for compelling respondents to make findings as to vacancy rates in certain alleged “ classes ” and to abolish rent controls in those classes after the holding of public hearings. Respondents have acted in good faith and are expressly entitled under the statute to an opportunity to complete the studies and investigation which they deem necessary before they are obliged to decide how each particular class shall be made up and what the vacancy rate of each class is. The allegations of the petition fail to establish, even prima facie, that respondents’ delay in fixing the classes to be used for the purposes of section Y51-12.0 is unreasonable or that it is due to bad faith on respondents’ part.
Petitioner urges that Dr. Rapkin’s report cannot change the census figures. It has been pointed out however, that the contract with Dr. Rapkin requires him to conduct research “ into other sources (i.e., other than the census) that provide information about the housing market in New York City. ” Respondents are not bound or precluded by the census data. It is also possible that on the basis of Dr. Rapkin’s report and analysis respondents may fix the classes for the purposes of section Y51-12.0 according tb rents in different ranges from those requested from the Census Bureau, in which event, as previously pointed out, there may be no class with vacancies of 5% or more. Whether respondents may also, in determining what shall constitute a particular class for purposes of 5% vacancy decontrol, take into consideration such factors as numbers of rooms and density of occupancy, as has been done under prior State aild city decontrols, is a question not necessary to decide for purposes of the motions now before the court.
Petitioner’s argument that the report of Dr. Rapkin is immaterial, because he was hired in connection with the comprehensive survey required by section Y51-16.0 and not for the purposes of section Y51-12.0, is without merit. Respondents are entitled to use the results of Dr. Rapkin’s research into sources other than the census figures and his analysis of the data, regardless of the purpose for which he was engaged. Ilis independent reseach into “ other sources ” may be taken into consideration in determining the vacancy rates, and his *848 analysis may aid in the determination of the classifications contemplated by section Y51-12.0.
Petitioner also contends that Dr. Bapkin’s contract may no longer be in force and that his report will never be used. The Administrator’s brief, however, states that respondents and Dr. Bapkin consider the contract to be in force and that they do intend to use it when it is received.
Petitioner’s motion is denied as premature, and respondents’ cross motion to dismiss the petition is granted on that ground. It is unnecessary, for the purpose of the present motions, to determine whether petitioner is obliged to exhaust administrative remedies before making an application of this character, or whether the petition sufficiently shows that petitioner is aggrieved by respondents’ inaction and may maintain this proceeding. The disposition here made is without prejudice to such remedies, administrative or otherwise, as petitioner may be advised to invoke, in the event of an unreasonable delay on the part of respondents after April 1, 1966 in determining the composition of the classes referred to in section Y51-12.0.